# APPENDIX EXHIBIT NO. 9

<u>Declaration of Brian Sears with attached exhibit</u>

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, and SHAWN McBEE and HEATHER CALVERT, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Civil Action No. 3:04-CV-242<br>) Varlan/Guyton<br>) |
| BRIDGESTONE/FIRESTONE NORTH AMERICAN TIRE, LLC d/b/a BRIDGESTONE/FIRESTONE, | )<br>)<br>) JURY TRIAL DEMAND |
| Defendant. | )<br>) |

## DECLARATION OF BRIAN SEARS

STATE OF TENNESSEE )

COUNTY OF DAVIDSON )

I, Brian Sears, declare, under penalty of perjury, as follows:

1. I am over eighteen years of age, and I make this Declaration based upon my own personal knowledge.

2. I am presently employed by Bridgestone/Firestone North American Tire, LLC ("Bridgestone") at its corporate office in Nashville as its Human Resources Division Manager. From May 2001 through July 2004, I was employed as the Labor Relations Manager for Bridgestone's Warren County, Tennessee manufacturing plant. In that capacity, my duties included the issuance of disciplinary action, up to and including discharge, to bargaining unit

employees; administration of company policies; investigation of complaints by bargaining unit employees; and interpretation and application of the collective bargaining agreement.

3. I met with Heather Calvert and Shawn McBee in September of 2002 to discuss some complaints that they had made, primarily relating to radio communications on their crew. I directed the investigation into their complaints. I initially met with Ms. Calvert on September 11, 2002 and with Ms. McBee on September 12, and I had multiple follow-up meetings with them to obtain additional information and apprise them of the progress of the investigation.

4. After meeting with Ms. Calvert and Ms. McBee, I interviewed those co-workers whom they alleged to be the "offenders" on the radio, Jamie Judkins, George Harrell, and Jason Jacobs. Each denied making any inappropriate remarks over the radio.

5. I also interviewed three uninvolved C-crew employees, Donna Rader, John Payne, and Shane Medley, who were known to be honest and direct.

6. The investigation that I conducted, which included interviews with Ms. Calvert and Ms. McBee; Ms. Rader, Mr. Payne, and Mr. Medley; Mr. Judkins, Mr. Harrell, and Mr. Jacobs; and various members of management, revealed that there may have been some isolated instances of unspecified juvenile behavior on the radio but that radio chatter had drastically reduced and improved overall.

7. Bridgestone management disciplined employees if and when we had proof that they had committed an infraction. The only individuals that Ms. Calvert and Ms. McBee identified to me as having engaged in a specific act of inappropriate behavior that could be confirmed, Chris Long and Chris Castner, had been disciplined accordingly. Mr. Long received a verbal warning (the first step in the progressive discipline process) for an inappropriate comment in a turnover meeting. Mr. Castner received a written warning (a further and more

serious step in the progressive discipline process) for "keying out" Ms. Calvert on the radio, which he admitted doing.

8. Another employee, George Harrell, was disciplined as well. Mr. Harrell made a remark about being "offended" by a bead cart, which Group Leader Chester Holyfield took as sarcastic because the graffiti in question was relatively innocuous. Mr. Harrell, like Mr. Long, received a verbal warning for his remark.

9. Ms. Calvert also mentioned to me some inappropriate graffiti on "bead carts," which are used for transporting beads (a tire component). I confirmed in the course of the investigation that the management of the tire room was already monitoring the bead carts and removing graffiti. I learned that graffiti on bead carts, about a variety of subjects and individuals, was common, but that Bridgestone was taking all feasible steps to remove and address it.

10. As a result of my investigation and the efforts of the tire room management, Bridgestone took several steps designed to address non-business radio communications and graffiti on bead carts.

11. Management closely monitored the work radios, including paying overtime to off-duty Group Leaders to sit in front of the central radio terminal in the tire room office and also tape recording the tire room radio communications for approximately a three-week period in the fall of 2002. This monitoring confirmed that unnecessary radio chatter had decreased dramatically.

12. Despite our ongoing investigation and corrective efforts, neither I nor others in management could pinpoint the precise offenders for the majority of allegations raised by Ms.

Calvert and Ms. McBee. Accordingly, management addressed their expressed concerns about radio communications and graffiti on bead carts with the entire crew in various ways.

13. It was practically impossible for me or anyone else in management to determine who had written inappropriate graffiti on bead carts. I confirmed that management continued to "sweep" the bead carts regularly for inappropriate graffiti, which was removed immediately when found, and Bridgestone implemented a regular cart-cleaning program in which all bead carts, several hundred of them, are completely cleaned. I have confirmed that the regular "sweeping" and cleaning of all bead carts continues today.

14. I made the decision to discharge Shawn McBee in January of 2004 for falsification. Specifically, we had received substantial evidence that she altered medical records that she submitted for the purpose of excusing absences that otherwise would have resulted in her termination for absenteeism per company policy.

15. Falsification is clearly proscribed as an immediately terminable offense per the Warren plant's Progressive Discipline Guidelines. A true, correct, and authentic copy of those Progressive Discipline Guidelines is attached as Exhibit A to this Declaration.

16. Perhaps the most overt falsification was on a physician's note that Ms. McBee submitted. The date of December 16 on the note had been changed to December 15. Upon inspection, it is clear that the "5" was written over the previously existing "6."

17. The staff of the physician's office confirmed that the note they had completed read December 16, not the back-dated December 15 on the note that Ms. McBee submitted. They faxed us a copy of the note as it existed in their file, and it was in fact dated December 16.

18. When I confronted Ms. McBee about the suspicious physician's note and another document that she submitted relating to her absences, she never admitted altering anything, including the physician's note.

19. The function of Bridgestone's Warren plant is manufacturing tires. For quality and production purposes, employees must be able to write notations, instructions, etc. on the tires themselves and the rubber used to make them at various stages of the manufacturing process. Accordingly, markers that write in silver ink, in order to be visible on the black tires, are used and are common at the Warren plant.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 13, 2005.

_____
BRIAN SEARS

# Bridgestone/Firestone Warren Progressive Discipline Guidelines

The following Progressive Discipline Guidelines are provided to serve as a guide in administering discipline at the Warren Plant. Any cases involving suspension must have prior approval of Labor Relations. Management may temporarily remove an employee from the job (send home for the balance of the shift) pending approval of the final disciplinary action, if the incident is considered serious enough to warrant immediate suspension or termination. Terminations will be handled in Labor Relations.

If after three (3) years, the employee's behavior has been corrected, such reports will not be used to support disciplinary action at arbitration. For Counseling Step, with the exception of the Attendance Program, after six months these will be stamped as "DISREGARD" for additional levels of discipline. Written Reprimands and Written Performance Reviews, with the exception of the Attendance Program, after one year these will be stamped as "DISREGARD" for additional levels of discipline.

If there are any questions concerning the following guidelines, contact Labor Relations.

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 |
|---|---|---|---|---|
| Absenteeism | Counseling | Step 1 | Step 2 | Step 3 |
| Refer to Attendance Program of CBA | | | | |
| Failure to observe departmental working schedules (starting work late, taking long lunches, taking long breaks, quitting work early) Note: References to starting work late and quitting work early do not pertain to tardies and leaving work early as defined under Article XII, Attendance Program | Counseling | Written Performance Review | 2 to 5 shifts suspension | Termination |
| Misrepresentation of information | 1 to 2 weeks suspension | Termination | | Termination. Labor Relations to review the entire record |

Exhibit A

| | Phase 1 | Phase 2 | Phase 3 | Phase 4 | Phase 5 |
|---|---|---|---|---|---|
| Sleeping during working hours [No sleeping on Company property allowed.] Flagrant offense would warrant immediate termination | 2 shifts suspension | Termination | | | |
| Reporting for work under the influence of intoxicating beverages or drugs | To include but not limited to: Mandatory EAP (follow-up random testing) or Termination | | | | |
| Refer to CBA Article XXVI and BFS Warren Policy for a Drug Free Workplace | | | | | |
| Possessing, manufacturing, or selling intoxicating beverages or drugs | To include but not limited to: Mandatory EAP (follow-up random testing) or Termination | | | | |
| Refer to CBA Article XXVI and BFS Warren Policy for a Drug Free Workplace | | | | | |
| Refusal to submit to drug testing | Possible criminal prosecution | | | | |
| Refer to CBA Article XXVI and BFS Warren Policy for a Drug Free Workplace | To include but not limited to: Mandatory EAP (follow-up random testing) or Termination | | | | |
| Arrest and conviction of illegal drugs | Report within five days of the incident | | | | |
| Refer to CBA Article XXVI and BFS Warren Policy for a Drug Free Workplace | To include but not limited to: Mandatory EAP (follow-up random testing) or Termination | | | | |

Release Date: 07/18/01

| Rule | Phase 1 | Phase 2 | Phase 3 | Phase 4 | Phase 5 |
|---|---|---|---|---|---|
| Probationary Employees: Any portion of overall work record not meeting BFSWN expectations | Termination | | | | |
| Refer to CBA Article VII | | | | | |
| Housekeeping | Counseling | Written performance review | 1 to 5 shifts suspension | Termination | |
| Failure to meet performance expectations based on departmental standards or failure to follow production procedures in the performance of work assignments in relation to quantity, and/or costs. | Counseling | Written performance review | 1 to 5 shifts suspension | Termination | |
| Failure to meet performance expectations in relation to quality and/or waste based on departmental standards | Written performance review | 1 to 5 shifts suspension | Termination | | |
| Failure to follow safe operating procedure and/or performing an unsafe act (includes but not limited to the operation of mobile equipment and abnormal condition procedures) | Written performance review; Serious cases resulting in injury and/or property damage may result in more severe disciplinary action up to and including termination. Deliberate violation would result in termination. | 1 to 5 shifts suspension | Termination | | |

| Rule | Phase 1 | Phase 2 | Phase 3 |
|---|---|---|---|
| Failure to wear or use required personal protective equipment. Includes adherence to provisions outlined in the Warren Safety Manuals (including, but not limited to, safety glasses, safety shoes) | Written performance review | 1 to 5 shifts suspension | Termination |
| Falsification of any Company document, including, but not limited to, employment application or any employment records, medical documentation, time and attendance records, production-related documents | Termination | | |
| Willful destruction of Company property Sabotaging equipment | Termination; possible prosecution and payment of damages | | |
| Performing work of a personal nature on Company Property | Written performance review | 1 to 5 shifts suspension | Termination |
| Insubordination | 2 weeks suspension Serious cases may result in more severe disciplinary action up to and including termination. | Termination | |

Release Date: 07/18/01

| Rule | Phase 1 | Phase 2 | Phase 3 | Phase 4 | Phase 5 |
|---|---|---|---|---|---|
| Using abusive language and directing it at fellow employees and/or management (includes discriminatory remarks) Refer to BFSWN Policy Against Harassment | 1 to 5 shifts suspension | 2 weeks suspension | Termination | | |
| Threatening fellow employees and/or management (includes threats of physical or bodily harm, etc.) Refer to BFSWN Workplace Violence Policy, 9/21/00 | 2 weeks suspension | Termination | | | |
| Fighting, wrestling, boisterousness, causing or inciting disturbances among employees (except in self-defense against an unprovoked attack). Refer to BFSWN Workplace Violence Policy, 9/21/00 | 2 weeks suspension | Termination | | | |
| Horseplay, disorderly conduct or similar misconduct on plant grounds. | 1 to 5 shifts suspension | 1 to 2 weeks suspension | Termination | | |

| Issue | Phase 1 | Phase 2 | Phase 3 | Phase 4 | Phase 5 |
|---|---|---|---|---|---|
| Possession of weapons on company premises at anytime Refer to BFSWN Workplace Violence Policy, 9/21/00 | Termination | | | | |
| Carrying camera in plant without Safety & Security Department's approval | 2 weeks suspension | Termination | | | |
| Non-compliance with company uniform policy. | Written performance review | 1 to 5 shifts suspension | Termination | | |
| Failure to carry Company badge in order to gain access to the plant | Counseling | Written reprimand | Written performance review | 1 to 5 shifts suspension | Termination |
| Failure to scan the time and attendance system | | | | | |
| Unauthorized reading material at operator station or on plant floor | Written performance review | 1 to 5 shifts suspension | Termination | | |
| Eating outside of designated areas or non-compliance with drinking container standard | Written performance review | 1 to 5 shifts suspension | Termination | | |
| Participation in playing cards and/or gambling on Company property | 1 to 5 shifts suspension | Termination | | | |
| Stealing, pilfering or removing any company property without written authority (value not important) | Termination and possible prosecution | | | | |

| Rule | Phase 1 | Phase 2 | Phase 3 | Phase 4 |
|---|---|---|---|---|
| Failure to follow the Reporting Off from Work procedure | Written performance review | 1 to 5 shifts suspension | 1 to 2 weeks suspension | Termination |
| Failure to follow the plant's LOTO program. If it is determined that an employee has knowingly committed an unsafe act which does or could have resulted in bodily injury or death, the employee shall be subject to discharge for the first offense. | Termination | | | |

The foregoing list of Progressive Discipline Guidelines does not limit management in its right to establish new or amended guidelines and procedures. All Progressive Discipline Guidelines are intended to respond to "normal" infractions with corrective and progressive discipline. Therefore, it must be understood that unusually severe infractions, depending upon the merits of the individual case, may warrant more severe disciplinary actions than stated in the Progressive Discipline Guidelines, up to and including discharge. The omission of a particular type of offense does not exclude the application of appropriate corrective counseling and discipline. All discipline, whether or not contained herein, is subject to the provisions contained in the Collective Bargaining Agreement.

Release Date: 07/18/01

D000315